❏ Original    ❏ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | **Case No. 25-809M(NJ)** |
| *or identify the person by name and address)* ) | |
| Records and information associated with the ) | Matter No. 2023R00322 |
| cellular devices assigned the call number (708) ) | |
| 986-7822, as further described in Attachment A ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:
   See Attachment A-1. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:
   See Attachment B.

        **YOU ARE COMMANDED** to execute this warrant on or before 2/21/2025 _____ *(not to exceed 14 days)*
   ❏ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Nancy Joseph _____.
                                                                            *(United States Magistrate Judge)*

        ☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
   ❏ for _____ days *(not to exceed 30)*   ☑ until, the facts justifying, the later specific date of _____ 08/06/2025 _____.

Date and time issued: 2/7/2025 @ 1:10 p.m. _____          *[signature]* Nancy Joseph
                                                                            *Judge's signature*

City and state:   Milwaukee, WI _____          Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                            *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

### Property to Be Searched

1. Records and information associated with the cellular devices assigned the call number (708) 986-7822 (referred to in the Affidavit as "**TARGET TELEPHONE #2**" and in Attachment B as the Target Cell Phone), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2. The Target Cell Phone.

## ATTACHMENT B

## Particular Things to be Seized

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.    The following subscriber and information about the customers or subscribers associated with the Target Cell Phone from the date of the signing of this warrant:

i.    Names (including subscriber names, usernames, and screen names);

ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.    Local and long-distance telephone connection records;

iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.    Length of service (including start date) and types of service utilized;

vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

2

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records, and

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023, to the present including:

a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose

3

the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving HAMMAD ISA and others known and unknown from the date of the signing of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in this Warrant.

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | )    Case No. 25-809M(NJ) |
| Records and information associated with the cellular devices assigned the call number (708) 986-7822, as further described in Attachment A | )    Matter No. 2023R00322 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1. This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A) and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) & 846 | Distribution of and possession with intent to distribute controlled substances; Conspiracy to distribute and to possess with intent to distribute controlled substances. |

The application is based on these facts:

See Attached Affidavit.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of <u>180</u> days *(give exact ending date if more than 30 days:* <u>08/06/2025</u> *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

SEAN MAYERBOCK (Affiliate)    Digitally signed by SEAN MAYERBOCK (Affiliate) Date: 2025.02.06 13:49:02 -06'00'

*Applicant's signature*

Sean Mayerbock, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone     *(specify reliable electronic means).*

Date: 2/7/2025

*Judge's signature*

City and state:   Milwaukee, WI      Honorable Nancy Joseph, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Sean Mayerbock, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.       I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(708) 986-7822** (**TARGET TELEPHONE #2** and **Target Cell Phone**), known to be used by Hammad ISA. **TARGET TELEPHONE #2**'s service provider is AT&T Corporation, a wireless telephone service provider ("Service Provider") headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida. **TARGET TELEPHONE #2** is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.       Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  *See* 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).

3.       I am a Detective with the City of Brookfield Police Department and have been a sworn law enforcement officer for over 8 years.  I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) – Drug Gang Task Force.  HIDTA is composed of law enforcement officers from the Milwaukee Police Department (MPD), Drug Enforcement Administration (DEA), Federal Bureau of Investigation (FBI), and several other federal and local law enforcement agencies.  Since November 2019, I have been a Task Force Officer with the

1

United States Department of Justice, Drug Enforcement Administration. As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses. As a federal law enforcement officer, I have participated in the investigation of narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, millions of dollars in United States currency, and other evidence of criminal activity.

4. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers. Furthermore, I have attended training courses that specialized in the investigation of narcotics trafficking. Through these investigations, my training and experience, and conversations with other law enforcement personnel, I have become familiar with the methods used by drug traffickers to manufacture, smuggle, safeguard, distribute narcotics, and to collect and launder trafficking-derived proceeds. I am further aware of the methods employed by major narcotics organizations to thwart any investigation of their illegal activities.

5. This affidavit is based upon my personal knowledge, training, experience, and upon information reported to me by other federal, state, and local law enforcement officers during

2

the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Throughout this affidavit, reference will be made to case agents. Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and to possess with intent to distribute controlled substances) have been committed, are being committed, and/or will be committed by Hammad ISA. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of other individuals who are engaged in the commission of these offenses.

8.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.     In August 2023, North Central HIDTA initiated a drug investigation involving the trafficking of cocaine and fentanyl from the area of Bellwood, Illinois to Milwaukee, Wisconsin via vehicle transportation. This investigation revealed that HAMMAD and FOAD ISA supply a number of individuals with narcotics, to include Timothy BEA in Milwaukee, Wisconsin.

3

10.     The investigation to date has included traditional law enforcement methods, including but not limited to: interviews with a confidential source/source of information; information from other law enforcement officers; documentary evidence; telephone toll data; physical and electronic surveillance; and surveillance; and court ordered Title III intercepts over six telephone lines including TARGET TELEPHONE 2.

## BACKGROUND INVESTIGATION

### Confidential Source Information

11.     In August 2023, a confidential source, hereinafter referred to as CS-1, identified Kenneth ROBY as a multi-kilogram level cocaine trafficker.  CS-1 informed case agents that CS-1 has personally purchased large amounts of cocaine from ROBY. CS-1 stated that ROBY resides with his wife in the area of N. 51st Boulevard and W. Congress Street in Milwaukee, Wisconsin. Case agents later identified that ROBY resides at 4338 N. 51st Boulevard, Milwaukee, Wisconsin, which is the same area as N. 51st Boulevard and W. Congress Street as referenced by CS-1. CS-1 stated the most narcotics that CS-1 has personally observed ROBY to be in possession of was three kilograms of cocaine. CS-1 stated CS-1 saw this at ROBY's residence (4338 N. 51st Boulevard). CS-1 estimated that ROBY is selling 10-15 kilograms a month based on conversations CS-1 has personally had with ROBY and based upon CS-1's personal observations. CS-1 stated CS-1 purchased one-half kilogram of cocaine from ROBY for $12,000 in July 2023 and saw ROBY with a full kilogram of cocaine in this same month.

12.     CS-1 has been providing information since August of 2023. The information CS-1 has provided is against CS-1's penal interest. The information provided by CS-1 is consistent with evidence obtained elsewhere in this investigation where CS-1 was not used, and much of CS-1's information has been corroborated through independent investigation, including law enforcement records, toll records, and other confidential sources. CS-1 is cooperating for

4

consideration relating to state charges for drug trafficking and possession of a firearm by a felon. CS-1 has been convicted of multiple felonies, to include multiple felonies for narcotics trafficking and firearms. Finally, CS-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe CS-1 is credible and CS-1's information reliable.

13.     CS-1 stated that ROBY is supplied cocaine from two brothers who own/operate "Bar 1000" located on Teutonia Avenue near Capitol Drive. CS-1 described the bar as newly remodeled and renamed. Case agents located a picture of "Bar 1000" located at 3941 N. Teutonia Avenue, and CS-1 confirmed this was indeed the bar from where ROBY obtains cocaine. Case agents later identified Myron BEA (DOB: xx/xx/1977) and Timothy BEA (DOB: xx/xx/1984) as the brothers who operate "Bar 1000." CS-1 stated that, based upon conversations between CS-1 and ROBY, ROBY is charged $19,000 for one kilogram of cocaine from the BEA brothers at Bar 1000.

14.     In November 2023, a source of information, hereinafter referred to as SOI-1, provided information on Dandre COLEMAN (DOB: xx/xx/1982) and Bar 1000. Case agents know that COLEMAN is a close associate of Timothy BEA from Bellwood, Illinois. SOI-1 identified COLEMAN as their source of supply for cocaine. SOI-1 stated SOI-1 met COLEMAN in prison and began purchasing cocaine from COLEMAN after communicating over Facebook messenger in the early months of 2022. During this time, SOI-1 and COLEMAN coordinated a deal for a kilogram of cocaine for approximately $24,000. COLEMAN directed SOI-1 to a bar that SOI-1 identified as Bar 1000. SOI-1 described Bar 1000 as being near Capitol and Melvina in the City of Milwaukee. Case agents know this is the general area of where Bar 1000 is located. SOI-1 stated that Bar 1000 was under a remodel at this time. Case agents know that Bar 1000,

5

formerly named "Gee Gee's," went through a full remodel before re-opening in approximately May of 2023, corroborating the information provided by SOI-1.

15. SOI-1 stated that SOI-1 was instructed to meet COLEMAN in the back of Bar 1000 in the alleyway. SOI-1 was escorted into Bar 1000 by COLEMAN and brought to the second-floor area, which SOI-1 described as a living quarters. SOI-1 was introduced to the owner of Bar 1000. SOI-1 could not remember the bar owner's name but informed case agents that SOI-1 would recognize the bar owner if SOI-1 saw him. SOI-1 received the kilogram of cocaine and stated the cocaine was good quality.

16. SOI-1 stated from that point on COLEMAN contacted SOI-1 if COLEMAN had a good price on cocaine. Following the first transaction with COLEMAN, SOI-1 stated that SOI-1 started obtaining 4 to 6 kilograms of cocaine per transaction for approximately $22,000 per kilogram. SOI-1 stated the next 3 or 4 transactions between SOI-1 and COLEMAN happened at Bar 1000 in the same manner as previously described. SOI-1 stated this changed around the summer of 2022. SOI-1 stated that SOI- 1 believed there was some type of disagreement between the bar owner (who case agents believe to be Timothy BEA) and COLEMAN about the amount of money each would profit from narcotics deals. COLEMAN began having SOI-1 meet him at a hotel in downtown Milwaukee to conduct their narcotics deals. SOI-1 explained that COLEMAN, or one of COLEMAN's associates, would get a hotel room and tell SOI-1 what room it was.

17. SOI-1 stated that SOI-1 always paid for the kilograms of cocaine up front and was never "fronted" with the cocaine. SOI-1 stated SOI-1 received a better price on the cocaine by always paying up front. SOI-1 stated the last time SOI-1 dealt with COLEMAN was before SOI-1's arrest in April 2023 when SOI-1 purchased 10 kilograms of cocaine for $19,700 per kilogram. SOI-1 estimated, in total, since the early months of 2022 through April of 2023, SOI-1 received

45-55 kilograms of cocaine through COLEMAN. SOI-1 further explained that SOI-1 believed that COLEMAN was "coat tailing" the owner of Bar 1000 for the narcotics. Because COLEMAN made statements referring to "my brother's bar," SOI-1 believed that COLEMAN was ultimately middling the deals between SOI-1 and the Bar 1000 owner. Additionally, SOI-1 explained on one occurrence, when SOI-1 and COLEMAN were on the phone discussing prices, SOI-1 overheard COLEMAN talking to someone else and asking permission to sell drugs for a certain price. SOI-1 stated SOI-1 assumed it was the owner of Bar 1000 from whom COLEMAN would "get permission."

18.    SOI-1 stated COLEMAN, and the owner of Bar 1000 sell both cocaine and fentanyl and had just as much fentanyl as cocaine. SOI-1 stated COLEMAN, and the Bar 1000 owner sold kilograms of fentanyl for approximately $45,000. SOI-1 stated SOI-1 received a few ounces of fentanyl from COLEMAN in the past; however, SOI-1 never purchased more because SOI-1 preferred to sell cocaine.

19.    In February 2024, case agents met with SOI-1 who further detailed SOI-1's dealings with COLEMAN and Bar 1000. The SOI-1 informed case agents that SOI-1 remembered the name of the Bar 1000 owner as "Tim." Case agents showed SOI-1 a photo of Timothy BEA, and SOI-1 believed it to be Timothy BEA. SOI-1 referenced a photo that was located on Dandre COLEMAN's Facebook account, which photo depicted BEA and COLEMAN among others. SOI-1 stated that in this photo BEA is wearing a red hoodie, standing in the back, wearing a hat. Case agents later received the referenced Facebook photo and in this photo case agents identified Timothy BEA as the subject wearing the red hoodie, standing in the back, wearing a hat.

20.    Case agents asked SOI-1 about the first time SOI-1 met Timothy BEA, and SOI-1 stated it was the first time SOI-1 conducted a narcotics deal at Bar 1000. SOI-1 stated SOI-1's first conversation with Timothy BEA was more about Timothy BEA "feeling out" SOI-1 to ensure

SOI-1 could be trusted. SOI-1 further described the dynamic between COLEMAN and BEA, describing BEA as more of a "co-signer" as it pertained to SOI-1 doing narcotics deals with COLEMAN. SOI-1 described it as BEA being the final approver of the dealings, and that COLEMAN needed BEA's approval as BEA was at the top of the hierarchy. Ultimately, based on the interactions, there was no doubt in SOI-1's mind that Timothy BEA was the person in charge and COLEMAN was a worker of BEA's who benefitted with a cut of the narcotics proceeds from bringing SOI-1 in as a customer. SOI-1 explained that SOI-1 knew the narcotics came from the Chicago-land area, based upon conversations SOI-1 had with COLEMAN and SOI-1's knowledge that BEA and COLEMAN are childhood friends from the Chicago-land area.

21. SOI-1 has been providing information since November of 2023. The information SOI-1 has provided is against SOI-1's penal interest. The information provided by SOI-1 is consistent with evidence obtained elsewhere in this investigation where SOI-1 was not used, and much of SOI-1's information has been corroborated through independent investigation, including law enforcement records, toll records, and other confidential sources. SOI-1 is cooperating for consideration relating to state charges for Conspiracy to Commit Manufacture/Deliver Cocaine. SOI-1 has been convicted of multiple felonies, to include multiple felonies for narcotics trafficking and firearms. Finally, SOI-1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. Within the context of the information detailed and relied upon for purposes of this affidavit, case agents believe SOI-1 is credible and SOI-1's information reliable.

22. On July 20, 2023, COLEMAN was charged in Kenosha County Circuit Court with Possession with Intent – Cocaine (>40g) and Obstructing an Officer. *See State of Wisconsin v. Dandre R. Coleman*, Kenosha County Case Number 2023CF001102. COLEMAN pled guilty to the charge of Possession with Intent – Cocaine (<40g) on April 4, 2024.

## Bar 1000 Operations and Surveillance

23.     During surveillance operations between approximately mid-September up to the present time, case agents have observed Timothy BEA on very regular basis at Bar 1000. Case agents located a Facebook page for Timothy BEA (https://www.facebook.com/tim.bea.96).  On this Facebook page, Timothy BEA lists that he lives in Milwaukee, Wisconsin and is from Bellwood, Illinois. Additionally, Timothy BEA has multiple posts marketing Bar 1000, further showing his involvement/ownership of the Bar.  Through surveillance of Bar 1000, case agents observed that the bar has multiple exterior surveillance cameras covering every side the bar. Based on training and experience case agents know that surveillance cameras are often used by narcotics dealers to conduct counter surveillance on any law enforcement activity and to prevent robberies by rival narcotic dealers.

24.     Based on physical and electronic surveillance, phone record data, and court-authorized location data, case agents believe that Timothy BEA continues to engage in narcotics trafficking and that he uses Bar 1000 to facilitate the DTO. Furthermore, the evidence also leads case agents to believe that other DTO members, to include HAMMAD ISA and Foad ISA, meet Timothy BEA at Bar 1000 to further their narcotics trafficking.

25.     Case agents discovered HAMMAD ISA had been an identified target in multiple DEA investigations as a money courier/money launderer.  In April 2021, HAMMAD was identified in an undercover agent money pick-up investigation. HAMMAD was identified as the money courier who dropped a large amount of United States currency to an undercover agent. During this incident, HAMMAD was driving a gold-colored 2-door Lexus bearing IL registration Q198950 (same vehicle and registration HAMMAD was observed operating at Bar 1000).  Additionally, HAMMAD was identified in an HSI money pick-up investigation. In April 2021, an HSI undercover agent was in contact with a Mexican money broker regarding a money

9

contract. The undercover agent met with HAMMAD who provided the U.S. currency to the undercover agent. In this incident, HAMMAD was observed driving the same 2-door Lexus bearing IL registration Q198950.

26.     Based on case agents' training and experience, they know that narcotic traffickers will often have "traps" located in areas of a vehicle to avoid law enforcement detection. A "trap" is a term that describes a hidden area or compartment to place narcotics and/or currency to conceal said illegal items from being located. Based on their training, experience, and familiarity with this investigation, case agents believe that HAMMAD is using the engine block of his vehicle as a trap.

27.     On October 17, 2023, at approximately 2:46 p.m., electronic surveillance at Bar 1000 reflected that Timothy BEA arrived in a silver Jaguar XJ8 with WI registration AUW-1498. Timothy BEA parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:45 p.m. a subject wearing a white coat walked to the rear of the bar from the front. This subject was later identified as HAMMAD. HAMMAD was observed placing a cell phone up to his ear. Case agents reviewed pen register data for Timothy BEA's phone number of 414-552-2844. According to the pen register data, Timothy BEA received a phone call from **TARGET TELEPHONE #2** at 3:45 p.m. One minute after HAMMAD called Timothy BEA, Timothy BEA exited the rear of the bar and subsequently went back into the bar with HAMMAD following behind. When HAMMAD walked into the bar he was carrying a white bag in his left hand. Once HAMMAD and BEA entered the back area of the bar, they closed the gate behind them. At approximately 3:49 p.m., BEA and an unknown male black subject exited the rear of the bar. Timothy BEA was carrying a blue and tan colored bag, and the second unidentified subject was carrying a white box. Both subjects walked out of view of case agents. Shortly thereafter, Timothy BEA returned to the bar still carrying the blue and tan bag, while the unknown

10

male black returned to the bar no longer carrying the box. At approximately 3:58 p.m., HAMMAD and Timothy BEA exited the back of Bar 1000. HAMMAD was observed carrying a brown box in both of his hands. HAMMAD walked around the north side of the bar, toward the front, and exited the view of case agents. At approximately 4:37 p.m., BEA exited the bar, entered into the silver Jaguar, and left.

28.     On October 25, 2023, at approximately 3:21 p.m., electronic surveillance at Bar 1000 reflected that Timothy BEA arrived in the silver Jaguar, parked in the back of the bar, exited the vehicle, and entered into the back gate of Bar 1000. At approximately 3:41 p.m., HAMMAD was observed walking back and forth near the gate of Bar 1000 with his cell phone in hand for two minutes. At 3:43 p.m., Timothy BEA opened the back gate to Bar 1000 and let HAMMAD in. At approximately 3:47 p.m., HAMMAD was observed exiting the back gate of the bar and walking southbound in the alleyway, out of view of case agents. Timothy BEA was observed exiting the back gate of Bar 1000 approximately one minute later carrying a black garbage bag that appeared half full. Timothy BEA walked southbound through the alleyway in the same direction of HAMMAD. At 3:50 p.m., Timothy BEA was observed returning to the back gate of the bar with nothing in his hands. HAMMAD then returned to the bar with nothing in his hands at approximately 4:03 p.m. At approximately 4:06 p.m., HAMMAD's gray Lexus that case agents had seen on previous days left northbound through the alley behind Bar 1000.

29.     On October 27, 2023, at approximately 5:57 p.m., electronic surveillance reflected that Timothy BEA arrived in the silver Jaguar XJ8, parked in the back of the bar, exited the vehicle, and subsequently entered into the back gate of Bar 1000. At approximately 6:09 p.m., HAMMAD's gray Lexus bearing IL registration Q198950 parked behind Bar 1000. HAMMAD parked his vehicle with the front of the vehicle positioned near the back gate of Bar 1000.

HAMMAD exited the driver seat of the vehicle and approached the back gate of Bar 1000. Timothy BEA opened the gate for HAMMAD and let him into the bar.

30.    At approximately 6:11 p.m., Johnnie HAYNES (DOB: xx/xx/1970) arrived in his Maroon Dodge Ram pickup truck bearing Wisconsin registration TY6749 and parked in the rear of Bar 1000. Through investigation, HAYNES has been identified as an associate to Myron and Timothy BEA. HAYNES exited his vehicle and walked into the back of the bar. Shortly afterwards, HAMMAD exited the bar and approached the back of the Lexus. HAMMAD opened the trunk of the Lexus and reached in. HAMMAD closed the trunk and approached the front passenger door of the Lexus. HAMMAD opened the front passenger door, reached in, and then closed the door. HAMMAD walked around to the driver door, reached in and proceeded to walk to the front of the Lexus. HAMMAD stood between the hood of his vehicle and the back gate of Bar 1000, looking around the area in a suspicious manner. As HAMMAD stood near the gate of the bar and scanned the area, the back gate of the bar opened. HAMMAD stepped close to the back gate of the bar and was handed a black bag by someone wearing a black sweatshirt similar to the one Timothy BEA was wearing when he entered the bar. With the bag in hand, HAMMAD quickly turned around and opened the hood of his vehicle. HAMMAD was observed retrieving approximately five rectangular-shaped items wrapped in a shiny film and placed them into the black bag. These items were consistent in shape and size with that of a kilogram of narcotics. After filling the bag, HAMMAD closed the hood of the car and quickly entered the back gate of Bar 1000. At almost the same time HAMMAD entered the back gate with the black bag, HAYNES exited the back gate of the bar and left in his pickup truck.

31.    At approximately 6:14 p.m., Timothy BEA exited the back gate of the bar with a black bag in his hand and approached the area where his vehicle was parked. BEA parked his vehicle in an area that was partially blocked from case agents' view. Timothy BEA returned from

the area of his vehicle and went back into the bar with nothing in his hands. At approximately 6:20 p.m., a gold Cadillac SUV bearing Wisconsin registration ABU-1610 pulled into the alleyway behind Bar 1000 and parked. Case agents have observed Timothy BEA operating this same vehicle in the past. Timothy BEA exited the bar, walked in the direction of his Jaguar, which case agents could not observe. Shortly afterwards, Timothy BEA walked from the area of his Jaguar to the gold Cadillac SUV. Timothy BEA briefly met with the operator of the vehicle before returning to the bar. The gold Cadillac left immediately after meeting with BEA. At approximately 6:32 p.m., BEA exited the bar again and again met with the operator of the gold Cadillac, which returned to the bar. After a quick exchange between Timothy BEA and the driver of the gold Cadillac, Timothy BEA went back into the bar again. At approximately 6:40 p.m., HAMMAD exited the bar and again opened the hood of his vehicle. HAMMAD was observed either removing something from under the hood, or placing something in the engine block area, before closing it and getting into his vehicle. HAMMAD left the area immediately after getting into his vehicle.

32.     As stated previously, placing items in trap areas, like an engine block underneath the hood of a vehicle, is consistent with hiding illegal substances or drug proceeds. Additionally, based on their training and experience, case agents know that drug traffickers often scan the area around them when engaging in illegal activity in counter-surveillance efforts, or to detect the presence of any onlookers, including law enforcement officers and rival drug traffickers. Against the backdrop of Timothy BEA and HAMMAD's known narcotics distribution activities, the transfer of items located in the engine block of a vehicle is activity that is consistent with narcotics distribution.

**ONGOING INVESTIGATION**

**Authorized T-III Interceptions**

13

33.     As result of this investigation, on October 16, 2024, Chief Judge Pamela Pepper, United States District Court, Eastern District of Wisconsin signed a Federal Title III Wire Intercept authorizing the interception of communications over Target Telephone #1 (used by BEA) and **TARGET TELEPHONE #2** (used by HAMMAD).

34.     On November 14, 2024, District Judge J.P. Stadtmueller, United States District Court, Eastern District of Wisconsin, signed a Federal Title III Wire Intercept authorizing the continued interception of communications over **TARGET TELEPHONE #2** (used by HAMMAD), and the initial interception of communications over Target Telephone #3 (used by BEA), Target Telephone #4 (used by FOAD), and Target Telephone #5 (used by FOAD).

35.     On December 13, 2024, Chief Judge Pepper signed a Federal Title III Wire Intercept authorizing the continued interception of communications over **TARGET TELEPHONE #2** (used by HAMMAD), Target Telephone #3 (used by BEA), Target Telephone #4 (used by FOAD), Target Telephone #5 (used by FOAD), and the initial interception of communications over Target Telephone #6 (used by Larry MONEYHAM, a drug distributor sourced by the ISAs).

36.     On January 10, 2025, Chief Judge Pepper signed a Federal Title III Wire Intercept authorizing the continued interception of communications over **TARGET TELEPHONE #2** (used by HAMMAD), Target Telephone #3 (used by BEA), Target Telephone #4 (used by FOAD), Target Telephone #5 (used by FOAD), and Target Telephone #6 (used by Larry MONEYHAM).  Through intercepted calls and surveillance during these periods, case agents have confirmed that HAMMAD and FOAD work collaboratively to supply narcotics to BEA and others.  Interceptions to date have revealed that: HAMMAD and FOAD work hand-in-hand to distribute narcotics, that FOAD appears to coordinate the DTO's activities, and that HAMMAD

14

carries out the DTO's activities at FOAD's direction. Examples of relevant interceptions are detailed below.

37.     For example, on December 29, 2024, at approximately 1:36 p.m., Hammad ISA, using TARGET TELEPHONE 2, received a phone call from Foad ISA using TARGET TELEPHONE 4. After greeting each other, FOAD asked, "Where are you?" HAMMAD replied, "What is up dad? Dad, I'm calling the numbers, but it's not connecting." FOAD said, "Okay, let me call him right now." HAMMAD stated, "Just tell him I'm by him right now." FOAD asked, "Did you arrive?" HAMMAD responded, "Yes, I arrived," which FOAD acknowledged. Case agents reviewed HAMMAD's E-911/GPS ping location data at approximately 1:52 p.m. and observed that HAMMAD was near 3941 N. Teutonia Avenue in Milwaukee, Wisconsin.

38.     At approximately 1:40 p.m., Timothy BEA, using TARGET TELEPHONE 3, sent a text message to HAMMAD at TARGET TELEPHONE 2 which read, "2656 S 76th." Case agents know this to be the address next-door to BEA's residence. BEA resides at 2636 S. 76th Street, West Allis, Wisconsin. I believe that BEA mistyped the correct address.

39.     Case agents conducted electronic and physical surveillance at BEA's known address (2636 S. 76th Street). At approximately 1:42 p.m., electronic surveillance (pole camera video of the exterior of 2636 S. 76th Street) revealed the overhead garage door at 2636 S. 76th Street, opened. At this same time, a red Ford Fusion arrived and parked immediately in front of this residence. A taller black male exited the driver's seat and retrieved a dark suitcase from the trunk. A black female exited the front passenger seat of the Fusion, then entered the driver's seat. While this was happening, BEA's black Escalade exited the garage of the residence and drove around to the rear of the residence. The overhead garage door closed. The black male from the Fusion wheeled the suitcase to the front door as the Fusion departed the area. A short time later, the black male with the suitcase was allowed entry into the residence.

15

40.     At approximately 1:47 p.m., case agents established physical surveillance in the area of BEA's residence. At approximately 1:55 p.m., FOAD, using TARGET TELEPHONE 4, called HAMMAD at TARGET TELEPHONE 2. FOAD asked, "Did he talk to you?" HAMMAD answered, "Yeah, yeah. I'm going to his mom's house." FOAD acknowledged.

41.     At approximately 2:06 p.m., HAMMAD's known silver Lexus arrived at BEA's residence, and the overhead garage door opened. HAMMAD pulled his Lexus into the garage, at which point the garage door closed. Location data for TARGET TELEPHONE 2 revealed it was in the vicinity of BEA's residence at approximately 2:07 p.m. and 2:22 p.m. At approximately 2:25 p.m., the overhead garage door opened, HAMMAD's Lexus exited, and it departed the area.

42.     Based on the above observations and interceptions and based on subsequent communications between BEA and his drug customers, I believe that HAMMAD delivered marijuana to BEA at BEA's residence and, thereafter, BEA reached out to his customers to sell said marijuana. For example, on December 29, 2024, between 2:40 p.m. through 4:29 p.m., BEA, using TARGET TELEPHONE 3, exchanged text messages with Terri LATHON at (262) 573-1330. BEA asked, "What you paying," and LATHON replied, "Wht Yu want? Can I jus bring bck it like I was"? BEA texted, "I'll hit you whn I get around thr." LATHON wrote, "Ok, Yu didn't answer the question." BEA answered, "1700." LATHON replied, "Thts must be za." BEA said, "Ima drop sum off n will go from thr." LATHON wrote, "Ok thts high … Yu goin to let me bring the money back?" BEA replied, "Yea."

43.     I believe that BEA knows LATHON has an alternate source of supply of marijuana and asked how much LATHON was paying ("What you paying"). I believe that LATHON asked how much BEA was charging and if she could get the marijuana fronted to her ("Wht Yu want? Can I jus bring bck it like I was"). I believe that BEA advised he would charge LATHON $1,700 per pound ("1700"), and LATHON indicated that BEA must have a certain strain of marijuana

16

("Thts must be za"). I believe that BEA advised he would drop some off with LATHON to see if she liked it, ("Ima drop sum off n will go from thr"), and LATHON confirmed whether BEA would let LATHON pay later, ("Yu goin to let me bring the money back?"). BEA confirmed.

44. Case agents continued electronic and physical surveillance at BEA's known address (2636 S. 76th Street). At 3:41 p.m. a gray Subaru arrived and parked in front of BEA's residence. A few minutes later a black female exited the driver's seat of the Subaru and was allowed entry into the residence through the front door. At 3:51 p.m. a black male with a beard, a bald head, and wearing multi-colored jacket exited BEA's residence and walked to the Subaru. A short time later this same black male walked from the Subaru and re-entered BEA's residence. Based on this individual's appearance and case agents' familiarity with this investigation, case agents believe this individual was Anthony MOORE. MOORE was previously determined to be a close associate of BEA.

45. At 3:59 p.m. a black female exited BEA's residence, entered the gold Cadillac SUV parked in the driveway and departed the area.

46. At 4:04 p.m. a black male wearing a black jacket, and black pants appeared from the rear of BEA's residence and entered through the front door.

47. At 4:33 p.m. BEA, using Target Telephone #3, called Ngadah KAMANDA at (414) 467-4928. KAMANDA is believed to be a DTO distributer who obtains narcotics from BEA for distribution in the metro-Milwaukee area. KAMANDA asked, "Yeah, you said it's uh, it's still fucked up on the other way?" BEA responded, "Yeah, waiting like a motherfucker." Soon KAMANDA asked, "You said... what, what's the number on them zaddies [ph]? So I can uh, tell another motherfucker know or something." BEA answered, "Hell, no; I've been doing like four-fifty, four-hundred for these cuties and shit. KAMANDA said, "A'ight." BEA stated, "If they like that I think, you know, a motherfucker come through get a whole one I might charge them

17

sixteen and a half or something." KAMANDA clarified, "Sixteen and a half?" BEA replied, "Yeah, that's usually what I've been going for this business." KAMANDA said, "A'ight, shit, a'ight. I'll let you know somethin'."

48.     Case agents believe that in this call, KAMANDA inquired whether BEA still did not have cocaine or heroin available for purchase, ("it's still fucked up on the other way?"), and BEA confirmed he did not, ("Yeah, waiting like a motherfucker"). Case agents believe that KAMANDA then asked how much BEA would charge once he gets the cocaine or heroin so that KAMANDA could tell his customer(s) ("what's the number on them zaddies [ph]? So I can uh, tell another motherfucker know or something"). Case agents believe that BEA advised he charged $400-$450 for an unspecified quantity of cocaine or heroin ("I've been doing like four-fifty, four-hundred"). Case agents believe that BEA noted that if somebody wanted a larger quantity of cocaine or heroin (in context, likely a kilogram), BEA would charge $16,500 for that quantity ("a motherfucker come through get a whole one I might charge them sixteen and a half or something"). Case agents believe that KAMANDA asked to clarify $16,500 ("Sixteen and a half?"), and BEA confirmed.

49.     At 4:41 p.m. the gold Cadillac SUV arrived and parked in BEA's driveway. The same black female exited the driver's seat and re-entered the residence.

50.     On January 18, 2025, at approximately 4:40 p.m., FOAD ISA using Target Telephone #4 called HAMMAD, at (**TARGET TELEPHONE #2**). The two began the conversation discussing a prescription for FOAD as he was sick. FOAD asked HAMMAD what he was doing and HAMMAD stated, "I swear, nothing. I'm at work at the dealership. We are organizing the inside and the cabinets." FOAD replied, "What do you want me to bring you? Fried or grilled fish?" HAMMAD asked, "Are you going to Boston?" FOAD replied, "I went and

saw him and got the money from him. I'm on my way back and I will stop by Boston." The two continued discussing food before hanging up the phone.

51. Case agents know that historically, FOAD and HAMMAD will often get food at Boston Fish Market located at 412 N. Milwaukee Ave., Wheeling, IL after they have made a trip to Milwaukee, WI to see Timothy BEA. Case agents observed through E-911/GPS location data on Target Telephone #4 and Target Telephone #3, that BEA and FOAD met in the area of Gurnee, IL between 4:25 p.m. and 4:36 p.m. as they both pinged in the same location. Case agents believe that BEA owed money to FOAD and met him halfway to deliver said money ("I went and saw him and got the money from him. I'm on my way back and I will stop by Boston.").

52. On January 28, 2025, at approximately 12:00 p.m., HAMMAD ISA, using **TARGET TELEPHONE #2**, called Ata HUSSEIN, at (773) 899-9999. HUSSEIN stated, "Hello." HAMMAD, asked, "Wodie, [PH] you left?" HUSSEIN stated, "Yeah man, I had to go to the bank and give somebody some money." HAMMAD asked, "Are you at the crib area?" HUSSEIN replied, "Yeah, I'm Potbelly's I'm getting a sandwich and then going home." HAMMAD asked, "Which Potbelly's?" HUSSEIN stated, "The one on 95th by my house." HAMMAD stated, "Uh, fine. Imma [thought not finished] you think I have Joe pull up?" HUSSEIN stated, "Yeah, yeah. I'll put in the car for you." HAMMAD stated, "Fine, I'm heading there right now." HUSSEIN confirmed, "Alright, I'll be at the house." HAMMAD asked, "Fine, in the gas tank?" HUSSEIN confirmed, "Yup." HAMMAD stated, "Alright, bro.

53. From past conversations between HUSSEIN and HAMMAD, case agents know that HUSSEIN deals prescription pills such as Oxycodone. Additionally, case agents know that HAMMAD has provided HUSSEIN with customers essentially middling deals for profit. Based on the past knowledge of HAMMAD and HUSSEIN's dealings, case agents believe that HUSSEIN was leaving pills, presumably oxycodone, in his gas tank that HAMMAD ultimately

19

picked up ("Fine, in the gas tank?"). Case agents believe that HAMMAD was middling a deal providing prescription pills to a third party.

54. Since March 15, 2024, case agents have continuously monitored **TARGET TELEPHONE #2**'s location pursuant to standalone phone location warrants and the Title III orders discussed above. Since interceptions began over **TARGET TELEPHONE #2**, location data and monitoring of **TARGET TELEPHONE #2** has aided case agents in identifying HAMMAD's location in relation to his trafficking activities. For example, in December 2024, through the court ordered interceptions, case agents learned that HAMMAD was sent to pick up money at a DTO member's direction. Case agents used the location data for **TARGET TELEPHONE #2** during relevant calls to identify that HAMMAD was in Lansing, Illinois. Case agents used subsequent phone calls and location data to identify that HAMMAD likely picked up money in Lansing and drove back to the DTO member's business location where HAMMAD also works. Case agents also used location data for **TARGET TELEPHONE #2** on December 29, 2024, after intercepting a call between HAMMAD and FOAD. The location data from this phone call identified that HAMMAD was in the Milwaukee area. Without this location data, case agents may have not known that HAMMAD was in the area and would not have known to check the electronic surveillance at BEA's location to observe a possible meeting.

## **CONCLUSION**

55. Evidence obtained during this investigation leads case agents to believe that HAMMAD ISA continues to operate **TARGET TELEPHONE #2**. The location data associated with **TARGET TELEPHONE #2** will continue to assist case agents in conducting targeted physical surveillance and further identify the locations and individuals associated with and the nature and scope of HAMMAD ISA's drug trafficking activities.

56.     Case agents searched law enforcement databases to confirm that **TARGET TELEPHONE #2** is currently being serviced by AT&T.

57.     Case agents are requesting this warrant authorizing the initial collection of data related to **TARGET TELEPHONE #2** for 30 days to further investigate ISA's activities, and to identify locations to which ISA is traveling to further his drug distribution trafficking activities.

58.     Based upon my training and experience, I know that individuals involved in drug trafficking use their cellular telephones to contact other drug dealers and drug purchasers, and that information relating to their telephones may show the areas in which they are trafficking drugs and the individuals who they are contacting to sell or distribute the drugs. Based upon the facts in this affidavit, there is probable cause to believe that HAMMAD ISA is engaged in the trafficking and distribution of controlled substances and is using **TARGET TELEPHONE #2** while engaged in these crimes.  I further submit that probable cause exists to believe that obtaining the location information of **TARGET TELEPHONE #2** will assist case agents in determining HAMMAD ISA's criminal activities, to include meeting locations, co-conspirators, and sources of supply.

59.     In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to

21

a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

60.     Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **TARGET TELEPHONE #2**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

61.     I further know that some service providers can collect timing advance, or engineering data commonly referred to as per call measurement data (PCMD), RTT, True Call, Advance Timing, WebMap, or equivalent. Per-call measurement data estimates the approximate distance of the cellular device from a cellular tower based upon the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

## E-911 Phase II / GPS Location Data

62.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by

22

triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **TARGET TELEPHONE #2**, including by initiating a signal to determine the location of **TARGET TELEPHONE #2** on the Service Provider's network or with such other reference points as may be reasonably available.

63.     I know that AT&T Corporation can provide historical precision GPS location information, historical handset location data, and handset triangulation data, also known as Network Event Location System (NELOS) data. NELOS data may provide location data based upon the handset itself.

### Subscriber Information

64.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of

23

business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify **TARGET TELEPHONE #2**'s user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

65.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

66.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

67.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **TARGET TELEPHONE #2** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

68.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 180 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TARGET TELEPHONE #2** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify

24

confederates, and flee from prosecution. See 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. See 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. See 18 U.S.C. § 3103a(b)(2).

69.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I therefore request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TARGET TELEPHONE #2** outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1.      Records and information associated with the cellular devices assigned the call number (708) 986-7822 (referred to in the Affidavit as "**TARGET TELEPHONE #2**" and in Attachment B as the Target Cell Phone), that is in the custody or control of AT&T (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida.

2.      The Target Cell Phone.

# ATTACHMENT B

## Particular Things to be Seized

**I.**     **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Service Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

    a.    The following subscriber and information about the customers or subscribers associated with the Target Cell Phone from the date of the signing of this warrant:

        i.    Names (including subscriber names, usernames, and screen names);

        ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.    Local and long-distance telephone connection records;

        iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.    Length of service (including start date) and types of service utilized;

        vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records, and

27

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone for the time period February 1, 2023, to the present including:

   a. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

   b. information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received), as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

b. Information associated with each communication to and from the Target Cell Phone for a period of 30 days from the date of this warrant, including:

   i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

   ii. Source and destination telephone numbers;

   iii. Date, time, and duration of communication; and

   iv. All data about the cell towers (i.e., antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone will connect at the beginning and end of each communication, as well as timing advance or engineering data commonly referred to as per call measurement data (PCMD, RTT, True Call, Advance Timing, Network Event Location Operating System Information (NELOS), WebMap, or equivalent).

c. Information about the location of the Target Cell Phone for a period of 30 days during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

   i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Service Provider, the Service Provider is required to disclose the Location Information to the government. In addition, the Service Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location

28

Information unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. See 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846, involving HAMMAD ISA and others known and unknown from the date of the signing of this warrant.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider to locate the things particularly described in this Warrant.

29

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by T-Mobile US, Inc., and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of T-Mobile US, Inc. The attached records consist of _____.

I further state that:

a.      All records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of T-Mobile US, Inc. and they were made T-Mobile US, Inc. as a regular practice; and

b.      Such records were generated by T-Mobile US, Inc.'s electronic process or system that produces an accurate result, to wit:

1.      The records were copied from electronic device(s), storage medium(s), or file(s) in the custody of T-Mobile US, Inc. in a manner to ensure that they are true duplicates of the original records; and

2.      The process or system is regularly verified by T-Mobile US, Inc. and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

30

_____    _____
Date                          Signature

31